# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 17, 2014        Decided January 20, 2015

No. 13-5163

JOHN VANDERKAM AND GAYLYN DIERINGER,
APPELLANTS

v.

MELISSA VANDERKAM,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01907)

———

*Joseph R. Jeffery* argued the cause and filed the briefs for appellants.

*Charles F. Fuller* argued the cause and filed the briefs for appellee.

Before: TATEL and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Senior Circuit Judge* GINSBURG.

TATEL, *Circuit Judge*: The Employee Retirement Income Security Act of 1974 (ERISA) entitles certain spouses of pension plan participants to a survivor annuity unless waived pursuant to clearly defined procedures. In this case, the pension plan participant concedes that ERISA vested an annuity in his ex-wife, but nonetheless argues that Texas law, including his Texas divorce decree, requires entry now of a declaratory judgment that, after his death, she place her annuity payments into a constructive trust for his benefit. The district court rejected this claim, holding that ERISA preempts any state law or state-court decree that would otherwise defeat the spouse's vested annuity. For the reasons set forth in this opinion, we affirm.

## I.

ERISA protects retirement benefits for millions of pension plan participants and their beneficiaries. 29 U.S.C. § 1001(b). Finding that the stability of retirement benefits directly affects the national economy, *id*. § 1001(a), Congress acted to ensure that accrued benefits remain unaltered by individuals and states alike. It accomplished this by prohibiting participants from assigning or alienating their own benefits, *id.* § 1056(d)(1), and, with limited exceptions, superseding state laws that "relate to any employee benefit plan," *id*. § 1144(a). One exception rests on the fact that plan benefits are often considered marital community property, a domain traditionally reserved exclusively for state law. As a result, Congress exempted a narrow category of state-court orders, known as qualified domestic relations orders, from ERISA's anti-alienation and preemption provisions. *Id*. § 1056(d)(3)(A); § 1144(b)(7). A qualified domestic relations order is a state-court decree regarding marital property that creates or recognizes an alternate payee's right to ERISA-governed benefits—for instance, changing the plan beneficiary from a soon-to-be ex-spouse to a child. *Id*.

§ 1056(d)(3)(B)(i). In order to qualify for the exemption, the state-court order may neither change the type or form of benefits nor increase the actuarial value of the plan. *Id*. § 1056(d)(3)(D).

Despite this narrow exception, the protection of beneficiaries—especially spouses—remains a paramount ERISA objective. The crown jewel of ERISA's spousal protection, the qualified joint and survivor annuity, provides monthly support for surviving spouses in the event of a participant's death, whether occurring before or after retirement. *Id*. § 1055(a). Survivor annuity payments, equal to at least 50 percent of the participant's benefits, continue for the remainder of the surviving spouse's life. *Id*. § 1055(d)(1)(A). Although for most ERISA benefits, like life insurance and 401(k) plans, participants may unilaterally waive benefits or designate beneficiaries, participants are powerless to "defeat a . . . surviving spouse's statutory entitlement to an annuity." *Boggs v. Boggs*, 520 U.S. 833, 843 (1997). Without the spouse's written consent expressly acknowledging the effect of the waiver or new beneficiary designation, a participant can neither waive nor alter the survivor annuity in any way. 29 U.S.C. § 1055(c)(2). Under the version of the statute governing this case, moreover, the written consent must not only be witnessed by a plan representative or notary public, but also completed no more than 90 days before the annuity start date, *i.e.*, the date the participant either dies or retires. Retirement Equity Act of 1984, Pub. L. No. 98–397, 98 Stat. 1426 (1984) (codified as amended at 29 U.S.C. §§ 1055(c)(2), (c)(7) (1984)). If a participant fails to obtain this written and witnessed waiver within the 90-day time limit, the survivor annuity vests in the spouse upon the participant's retirement or death. Taken together, "[t]he surviving spouse annuity and [qualified domestic relations order] provisions, which acknowledge and protect specific pension plan community

property interests, give rise to the strong implication that other community property claims are not consistent with the statutory scheme." *Boggs*, 520 U.S. at 847.

This case presents a conflict between state community property law and ERISA. Specifically, we must determine whether, after a survivor annuity has vested and absent a qualified domestic relations order, the plan participant may use state law to obtain legal control over his former spouse's survivor benefit.

John and Melissa VanderKam married in 1984. An employee of the Huffy Corporation, John enrolled in the company's retirement plan and designated Melissa as the beneficiary of a 100-percent qualified joint and survivor annuity. John retired in 1994, at which time the survivor annuity irrevocably vested in Melissa, and John began receiving monthly benefits. Eight years later, in March 2002, John and Melissa divorced, agreeing to a decree awarding John all "benefits existing by reason of [John's] past, present, or future employment." Final Divorce Decree 19, J.A. 290.

One year later, John remarried and sought to designate his new wife as the survivor annuity beneficiary. Counsel for Huffy's pension plan advised John that this designation would be permissible if done pursuant to a qualified domestic relations order that, in accordance with ERISA, did not require the plan to increase benefits beyond actuarial estimates of John's and Melissa's life expectancies. *See* 29 U.S.C. § 1056(d)(3)(D). In order to meet this requirement, John motioned the Texas court to modify the divorce decree by including an order naming his new wife as the annuity beneficiary and calculating annuity benefits based upon Melissa's life expectancy. Melissa opposed John's motion, arguing that she had consented to the divorce decree only

because she believed that the survivor annuity belonged to her and was therefore entirely separate from John's retirement benefits. Her agreement to the decree, Melissa explained, resulted from a "trade-off between the parties" whereby "if [Melissa] kept the survivor benefit, . . . she would not touch the rest of [John's] retirement, which is quite a large sum." Hr'g on Mot. to Modify Tr. 7, J.A. 208. Also, pointing out that she was not a beneficiary of John's life insurance policy, Melissa emphasized that the survivor annuity would represent her primary means of providing for the couple's son in the event of John's death. Rejecting Melissa's arguments, the Texas court entered a purported qualified domestic relations order divesting Melissa of all ownership interests in John's retirement benefits, including the survivor annuity.

In 2005, Huffy terminated its pension plan, and because the plan had insufficient assets to provide the benefits promised to its employees, the Pension Benefit Guaranty Corporation (PBGC) became the plan's statutory trustee. Established by ERISA to provide pension benefit insurance and to "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans," *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 214 (1986) (citation omitted), PBGC independently determines the benefits it will pay under ERISA and the terms of the terminated plan. After reviewing John's file, PBGC determined that the supposed qualified domestic relations order was invalid and that Melissa remained the proper beneficiary of the survivor annuity. This ruling rested on two basic propositions. First, the Texas court order was not a valid qualified domestic relations order because it would require the plan to "provide a form of benefit, or [an] option, not otherwise provided under the plan." Letter from Deborah Martin, PBGC Coordinator, to John VanderKam (Dec. 18, 2009) ("PGBC Letter") at 3, J.A. 257. Should John's

new wife survive him, PBGC explained, she would receive survivor benefits for the remainder of *her* life, rather than the remainder of *Melissa's* life, which "would create a bizarre, hybrid form of benefit" unavailable under the plan. PBGC Letter 5, J.A. 259. Second, relying on ERISA's text and relevant federal court decisions, PBGC determined that unless waived in accordance with the procedure set forth in the statute and within the 90-day period, a spouse's right to the survivor annuity irrevocably vests on the annuity start date—here, the day John retired. Accordingly, "the order could not transfer Melissa's right to the survivor benefit to [the new wife]." PBGC Letter 6, J.A. 260.

After PBGC's Appeals Board affirmed the agency's initial determination, John filed suit in the United States District Court for the District of Columbia, challenging PBGC's decision as both contrary to ERISA and arbitrary and capricious in violation of the Administrative Procedure Act. Second Am. Compl. 2–11; Pls.' Mot. Summ. J. 12. In response, and citing Melissa's affidavit swearing that she "never intended to waive the survivor benefit" and "wish[ed] to claim [her] right to that benefit," PBGC asked the district court to join Melissa as a necessary party. Melissa VanderKam Aff., J.A. 12. After the district court granted that motion, John amended his complaint to allege unjust enrichment and breach of contract claims against Melissa, and, invoking a Texas statute, sought a declaration that given the divorce decree, John "has equitable title to the . . . survivor benefit payments" and that "upon actual receipt of the survivor benefit payments, [Melissa] will owe fiduciary obligations to John and hold those payments in constructive trust." Second Am. Compl. 13. The parties filed cross motions for summary judgment.

Relying on cases from the Fourth, Fifth, and Ninth Circuits, the district court found PBGC's two

determinations—that Melissa's claim to the survivor benefit irrevocably vested upon John's retirement and that the Texas court order was not a valid qualified domestic relations order—both reasonable and amply supported by the administrative record. *VanderKam v. Pension Benefit Guaranty Corp.*, 943 F. Supp. 2d 130, 141–46 (D.D.C. 2013). As to the state-law claims against Melissa, the district court found them preempted by ERISA, emphasizing that the claims "are nothing more than an effort to make an end-run around ERISA's statutory prescriptions" and would permit John "to achieve what [he] otherwise cannot accomplish under the statute itself—to divest Melissa of the survivor annuity benefit paid to her by PBGC." *Id.* at 150. The district court therefore granted summary judgment in favor of PBGC and Melissa.

After John filed his appeal here, we granted his motion to dismiss PBGC from the case, leaving only his appeal of the district court's grant of summary judgment in favor of Melissa on the state-law claims. Appellant's Mot. to Dismiss PBGC (Apr. 2, 2014). Before reaching those claims, however, we must address the threshold issue of whether this case is ripe for review. *See Exxon Mobil Corp. v. Federal Energy Regulatory Commission*, 501 F.3d 204, 207 (D.C. Cir. 2007) ("The question of ripeness goes to our subject matter jurisdiction, and thus we can raise the issue sua sponte at any time.") (internal quotation marks omitted).

## II.

Article III of the Constitution limits federal court jurisdiction to cases and controversies. U.S. Const. art. III, § 2. Consistent with this limitation and "our theoretical role as the governmental branch of last resort," the ripeness doctrine precludes premature adjudication of "abstract disagreements" and instead reserves judicial power for resolution of concrete and "fully crystalized" disputes. *National Treasury Employees*

*Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). Put simply, "Article III courts should not make decisions unless they have to." *Id.*

In this case, Melissa will receive no survivor benefits if she predeceases John, which suggests that "[i]f we do not decide [the case] now, we may never need to," *id*. Given our "independent obligation to assure ourselves of jurisdiction," *Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997), we ordered supplemental briefing regarding whether this case is ripe for judicial review.

To determine whether a dispute is ripe for judicial consideration, we must evaluate (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967).

Under the fitness element, "we look to see whether the issue is purely legal" or instead "would benefit from a more concrete setting." *National Association of Home Builders v. U.S. Army Corps of Engineers*, 440 F.3d 459, 463–64 (D.C. Cir. 2006). The facts of the present case are undisputed, as is PBGC's determination that ERISA vested the survivor annuity in Melissa. The single question presented—whether ERISA preempts John's attempt to gain equitable title to Melissa's survivor annuity—is thus purely legal. The fitness element also requires that we consider whether "deciding the issue now would violate principles of judicial restraint and efficiency that counsel against spending [our] scarce resources on what amounts to shadow boxing." *Alcoa Power Generating, Inc. v. FERC*, 643 F.3d 963, 967 (D.C. Cir. 2011) (citations and internal quotation marks omitted). Addressing this purely legal question now raises no concern about inefficiency or waste of judicial resources.

As to the second element, we agree with John that denial of judicial review would presently cause him significant hardship, as it would "interfere[] with John's ability to make decisions about the organization of his estate and the distribution of his property after his death." Appellant's Supplemental Br. 2. The very purpose of ERISA benefits, especially benefits accruing to dependents and spouses, is to provide economic security and peace of mind. 29 U.S.C. § 1001(a) (noting ERISA's objective to protect "the continued well-being and security of millions of employees and their dependents"). Indeed, ERISA expressly authorizes preemptive litigation to "clarify . . . rights to *future* benefits under the terms of [a] plan." *Id*. § 1132(a)(1)(B) (emphasis added).

True, Melissa may predecease John, but John seeks declaratory relief *now*—relief that would be independent of any future events. John seeks not a constructive trust that will spring into existence only if Melissa someday receives the annuity payments, but rather a *current* declaration that he "*has* equitable title to the . . . survivor benefit payments" and that "upon actual receipt of the . . . payments, [Melissa] *will* owe fiduciary obligations to John and hold those payments in constructive trust." Second Am. Compl. 13 (emphases added). A final decision regarding John's entitlement to such a declaration would give him an immediate, concrete, and valuable benefit: certainty regarding whether monthly annuity payments will be paid to his ex-spouse and son's mother, or whether he can assign those payments to a different beneficiary of his choosing. This case thus presents a fully crystalized dispute ripe for our resolution.

## III.

Having elected to dismiss his appeal against PBGC, John makes three key concessions: (1) that the survivor annuity

vested in Melissa upon his retirement, (2) that any supposed waiver in the divorce agreement was invalid under ERISA, and (3) that the Texas court order was not a valid qualified domestic relations order. In other words, John concedes that under ERISA, the survivor annuity belongs to Melissa. Given this, we face a single question: May John use state law to seize a benefit that federal law has vested in Melissa?

ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Despite the simplicity of the statutory text, "ERISA pre-emption questions are recurrent," reflecting "the comprehensive nature of the statute, the centrality of pension and welfare plans in the national economy, and their importance to the financial security of the Nation's work force." *Boggs*, 520 U.S. at 839. But in *Boggs v. Boggs*, a decision central to our resolution of this case, the Supreme Court helpfully narrowed the ERISA preemption inquiry. Under *Boggs*, rather than examine conflicts between state law and ERISA's text, we may "simply ask[] if state law conflicts with the provisions of ERISA or operates to frustrate its objects." *Id*. at 841. And as instructed by the Court in *Hillman v. Maretta*, in order to answer that question, "we must first ascertain the nature of the federal interest." 133 S. Ct. 1943, 1950 (2013).

In this case, the nature of the federal interest is obvious. Congress designed ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). With respect to qualified joint and survivor annuities specifically, Congress displayed special "solicitude for the economic security of surviving spouses" and legislated to "provide detailed protections to spouses of plan participants which, in some cases, exceed what their rights would be were [state]

community property law the sole measure." *Boggs*, 520 U.S. at 843, 841. Prior to ERISA, no law required that pension plans support spouses beyond the life of the participant. H.R. Rep. No. 93–807, at 4732 (1974). Recognizing that this void could "result in a hardship where an individual primarily dependent on his pension as a source of retirement income is unable to make adequate provision for his spouse's retirement years should he predecease her," Congress required that "if a plan provides for a lifetime annuity" for participants, "the plan must [also] provide for a joint and survivor annuity." *Id*. Congress strengthened these provisions in 1984 by enacting the Retirement Equity Act (REA), which enlarged ERISA's protection for surviving spouses in three significant respects. First, although the joint and survivor annuity was initially a mere "option entirely within a participant's discretion," *Boggs*, 520 U.S. at 843 (citing 29 U.S.C. §§ 1055(a), (e) (1982)), the REA removed that discretion by prohibiting a participant from waiving the survivor annuity without spousal consent, *Boggs*, 520 U.S. at 843 (citing 29 U.S.C. § 1055(c)). Second, as evidence of Congress's concern not only for surviving spouses, but also for "spouse[s] and dependent children in the event of divorce or separation," *Boggs*, 520 U.S. at 847, the REA made annuities payable to surviving spouses so long as the spouse was married to the participant at the time of retirement—regardless of marital status at the time of the participant's death, *Hopkins v. AT & T Global Information Solutions Co.*, 105 F.3d 153, 156 (4th Cir. 1997) (citing 29 U.S.C. §§ 1055(a), (f)). Third, although ERISA initially had nothing to say about whether and how beneficiaries could waive survivor benefits, the REA established a clear and defined procedure for waiving a survivor annuity, requiring an express, witnessed waiver within 90 days of the annuity start date. 29 U.S.C. §§ 1055(c)(2), (c)(7)(A). Through these three amendments, Congress recognized "the status of marriage as an economic partnership" and sought to protect "the substantial

contribution to that partnership of spouses who work both in and outside the home." Retirement Equity Act of 1984, Pub. L. No. 98–397, 98 Stat. 1426 (1984).

Against this clear congressional objective—ensuring ongoing financial support for divorced and surviving spouses—John invokes a Texas statute providing that "[t]he subsequent actual receipt by the non-owning party of property awarded to the owner in a decree of divorce or annulment creates a fiduciary obligation in favor of the owner and imposes a constructive trust on the property for the benefit of the owner." Tex. Fam. Code Ann. § 9.011(b). Despite conceding that ERISA vested the survivor benefit in Melissa, John argues that the divorce decree and this Texas statute entitle him to a declaration that he "has equitable title" to Melissa's survivor benefit, and that upon receipt of her annuity, Melissa is bound by Texas law to deliver it to John's designee. Second Am. Compl. 13.

The conflict between ERISA and Texas law could hardly be starker—what ERISA gives to Melissa, John argues, Texas takes away. But as the Supreme Court held in *Boggs*, "in the face of this direct clash between state law and the provisions and objectives of ERISA, the state law cannot stand." *Boggs*, 520 U.S. at 844. Any other result would frustrate Congress's objective to provide "*enhanced* protection to the spouse and dependent children in the event of divorce" by "ensur[ing] a *stream* of income to surviving spouses." *Id*. at 847, 843 (emphases added). Simply put, John may not use Texas law to compel an outcome expressly barred by ERISA.

John nonetheless insists that his claims fall outside ERISA's preemption of state laws that "relate to any employee benefit *plan*," 29 U.S.C. § 1144(a) (emphasis added), because he seeks title only to Melissa's *benefits*. In *Boggs*, however, the

Supreme Court expressly rejected this argument. There, a participant's first wife attempted to transfer her survivor annuity benefits to the couple's adult sons through her will. *Boggs*, 520 U.S. at 833. After her death, the participant married his second wife, in whom the survivor annuity vested after the participant's death and against whom the sons attempted to enforce the testamentary transfer. *Id.* Holding the state law permitting the transfer preempted, the Court rejected the argument that the claims "affect[ed] only what a plan participant may do with his or her benefits after they are received and not the relationship between the pension plan administrator and the plan beneficiary." *Id.* at 838. Accepting that argument, the Court declared, "would undermine the purpose of ERISA's mandated survivor's annuity." *Id.* at 844. So too here.

John also contends that although the divorce agreement is invalid as a waiver of Melissa's right to *receive* her survivor annuity under ERISA, the agreement remains a valid waiver of Melissa's right to *retain* her benefits under Texas law. In fact, he argues, Melissa is collaterally estopped from arguing otherwise. But this argument only highlights the conflict between ERISA and the Texas statute: state law may not resurrect an agreement invalidated by federal law. And, like John's plan vs. benefits argument, the distinction between the right to receive benefits, as opposed to the right to retain them, has been expressly rejected by the Supreme Court. In *Hillman*, the Court invalidated a state law that imposed personal liability on beneficiaries of life insurance under the Federal Employee Group Life Insurance Act, holding that with a beneficiary's designation "comes the expectation that the . . . proceeds will be paid . . . *and that the beneficiary can use them*." 133 S. Ct. at 1953 (emphasis added). Indeed, "the term 'beneficiary' itself . . . would be meaningless if the only effect of a designation were to saddle the nominal beneficiary with

liability under state law for the full value of the proceeds." *Id*. at 1956 (Thomas, J., concurring). For this reason, the Court held, "where a beneficiary has been duly named, the . . . proceeds she is owed under [federal law] cannot be allocated to another person by operation of state law." *Id*. at 1953. That reasoning applies with equal force to ERISA beneficiaries.

Finally, John points to the Supreme Court's decision in *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, which expressly left open the question whether, after benefits are distributed, state courts can enforce a beneficiary's waiver of her interest in pension plan benefits. 555 U.S. 285, 299 n.10 (2009). Some courts, most recently the Fourth Circuit in *Andochick v. Byrd*, have held that such suits are not preempted by ERISA because there is "no conflict with either ERISA's objectives or relevant Supreme Court precedent." 709 F.3d 296, 298 (4th Cir. 2013). Unlike *Andochick*, however, this is not a post-distribution case. Rather, as explained above in our ripeness discussion, John seeks a *pre-distribution* declaration that he *currently* "has equitable title to the . . . survivor benefit payments." Second Am. Compl. 13. Moreover, none of the cases John cites, including *Kennedy*, involves survivor annuity benefits. Instead, they concern other ERISA benefits, such as life insurance and 401(k) plans, that are not subject to the rigorous waiver provisions that govern survivor annuities. With respect to survivor annuities, absent an express and witnessed waiver, "Congress has spoken with force and clarity in directing that the proceeds belong to the named beneficiary and no other." *Hillman*, 133 S. Ct. at 1951 (citation omitted).

Indeed, the Ninth Circuit, the only circuit to have considered the *Kennedy* question in the survivor annuity context, concluded that permitting a "constructive trust on the

proceeds of a pension plan . . . would allow for an end-run around ERISA's rules and Congress's policy objective of providing for certain beneficiaries, thereby greatly weakening, if not entirely abrogating, ERISA's broad preemption provision." *Carmona v. Carmona*, 603 F.3d 1041, 1061 (9th Cir. 2008). We agree. The survivor annuity waiver provisions are aimed at preventing precisely this type of situation, where a participant seeks to enforce an invalid waiver of his spouse's primary means of supporting herself following a divorce.

In conclusion, we emphasize the narrowness of our opinion. This case involves an effort by a plan participant to obtain an interest in *undistributed* plan benefits, and we hold only that absent a qualified domestic relations order and compliance with ERISA's strict waiver provisions for survivor annuities, he may not use state law for that purpose. This opinion has nothing to say about how ERISA might affect an effort by a plan participant to use state law to obtain an interest in benefits *after* distribution to the beneficiary. That question is not presented in this case, and we express no opinion on it.

## IV.

For the reasons given above, we affirm the judgment of the district court.

*So ordered.*

GINSBURG, *Senior Circuit Judge*, concurring:

Although I agree John VanderKam may not use state law to obtain an interest in Melissa VanderKam's ERISA-protected survivor annuity, I write separately to emphasize that the Court has not today decided all state laws are preempted insofar as they burden qualified joint and survivor annuity (QJSA) benefits that have not yet been disbursed. The Court's holding is necessarily limited to the situation in which the claimed source of authority for obtaining an interest in QJSA benefits is an agreement in the divorce decree of a plan participant and his beneficiary in which the beneficiary purports to waive her right to the survivor annuity. Because other ways of obtaining an interest in ERISA benefits, specifically those to which the Congress spoke in the anti-alienation provision of 29 U.S.C. § 1056(d), are not before us, we have no occasion to decide whether the requirements for assignment and alienation in § 1056(d) preempt a state law that would transfer the annuity pursuant to an agreement to assign rather than to waive the benefits.

John argues that although the divorce decree did not give rise to a valid qualified domestic relations order (QDRO), the requirements for a QDRO in § 1056(d) are intended only to "creat[e] a path for participants and beneficiaries to enforce their private agreements *directly against a plan*" and therefore do not preempt a state law that is used to enforce directly against a beneficiary her agreement to alienate her benefits. John's argument is beside the point because Melissa "did not assign or alienate anything to [John] or to the Estate later standing in his shoes." *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 292-97 (2009) (holding a nearly identical provision of a divorce decree was an attempted waiver, not an assignment, and therefore should not be analyzed for validity under the requirements for a QDRO). It is therefore sufficient today for us to hold the QJSA provision in ERISA preempts a state law that would give

effect to an otherwise invalid waiver of QJSA benefits; we need not address whether the QDRO provision preempts a state law that provides a different way of obtaining an interest in QJSA benefits. An example might be a car dealer suing a QJSA beneficiary who gave the dealer a security interest in her future stream of benefits in exchange for a car.